# CHARLESTON.

## STRAUGHAN v. HALLWOOD.

Submitted September 15, 1887.—Decided November 12, 1887.

1. EQUITY—DETINUE—SUIT TO COMPEL RETURN OF PROPERTY TO STATE.

A chancery suit can not be sustained to compel an insolvent defendant, in an action of detinue pending in this State, to bring back into this State, or to appoint a receiver to do so, the property sued for, to answer the final judgment in such action of detinue, if the defendant had, before the institution of such action of detinue, *bona fide* sold or pledged such property to a non-resident of this State, and actually put him in possession thereof, and he had it in his possession at his residence, though the property had been sent to him and thus removed from the State for the purpose of preventing its recovery or attempted recovery by an action of detinue, which the defendant expected the plaintiff would institute in this State, where the parties resided.   (p. 283.)

2. EQUITY—SUPPLEMENTAL BILL—SUBSEQUENT FACTS.

A party who has no cause of action at the time of filing his original bill can not maintain his suit by filing a supplemental bill, stating facts subsequently arising out of the transaction, the subject of the original bill; and such supplemental bill should be dismissed at the hearing, though filed by leave of the court without objection, and though not demurred to by the defendant.   (p. 292.)

3. EQUITY—SUPPLEMENTAL BILL—CONFLICT WITH ORIGINAL BILL.

A supplemental bill is an addition to the original bill, to be read with it, and should therefore be consistent with it; and, if the grounds on which it is based are in utter and irreconcilable conflict with the grounds on which the original bill was based, such supplemental bill should be dismissed at the hearing, though filed by leave of the court without objection.   (p. 294.)

Statement of the case by GREEN, JUDGE:

The defendant, Henry S. Hallwood, claimed that about January 1, 1882, he purchased of George Straughan, the plaintiff's father, a theodolite and a part of a set of drawing instruments. Mathew H. Straughan claimed that this property all belonged to him, and he brought a suit for it against Henry S. Hallwood before a justice of the county of Ka-

nawha, where Hallwood resided. He decided in favor of Hallwood, and an appeal was taken to the Circuit Court. Hallwood brought a cross-suit in the Circuit Court of said county, on the chancery side, in reference to this property, and some accounts and claims he set up against George Straughan. But this common-law suit and chancery suit were compromised about March 1, 1886, though, for reasons stated in the opinion, the written agreement setting out the terms of the compromise was not executed by the parties till about March 20, 1886. This agreement was, however, dated March 1, 1886. It was as follows :

"Whereas, certain litigation and matters of difference exist between Henry S. Hallwood and Mathew P. Straughan and the said Hallwood and George Straughan, now for the purpose of settling and adjusting such litigation and matters of difference, the said Hallwood, Mathew Straughan and George Straughan agree with each other and bind themselves as follows : The suits of *Mathew Straughan* v. *Henry S. Hallwood*, pending in the Circuit Court of Kanawha county, on appeal from a justice, and of *Henry S. Hallwood* v. *George Straughan and Mathew Straughan*, pending in said court on the chancery side, shall both be dismissed, each party paying his own costs ; and the judgment obtained before the said justice is hereby vacated, annulled and surrendered up; and the said dismissal of said appeal is intended to operate as an avoidance and nullification of said judgment. The said Hallwood agrees to deliver up immediately to the said George Straughan all books, documents, papers, writings, vouchers and accounts in his possession or under his control, belonging or in any way relating to the business or private transactions of the said George Straughan, and also all letters in his possession or under his control, written by the said George Straughan. The said Hallwood and the said George Straughan hereby release to each other every claim, demand, debt or liability that each may have or claim against the other, and hereby mutually acknowledge full satisfaction thereof. The theodolite and set of drawing instruments, for which the said action of *Mathew Straughan* v. *Henry S. Hallwood* was brought, are hereby

admitted to be the property of said Mathew Straughan; and the said Mathew Straughan hereby agrees to sell said theodolite and so much of said set of drawing instruments, as the justice gave judgment for in said action, to said Hallwood for the sum of $125.00, on the following terms and conditions: Said Hallwood is to have 90 days from the date of signing and sealing of this agreement to pay said sum for said theodolite and part of set of drawing instruments, the title whereto to remain in said Mathew Straughan until paid for by said Hallwood according to this agreement; and, by express contract of the parties, the time for paying for the same, as above provided, is made the essence of this agreement, and, in default thereto or therein by said Hallwood, all his right, title and interest thereto or therein is gone forever, and said theodolite and part of set of drawing instruments are to be surrendered up to the said Mathew Straughan. The possession of said theodolite and part of set of drawing instruments until paid for, or default made in the payment thereof, as above provided, shall remain with James H. Sentz and W. B. Stevens, trustees of the Peerless Coal Company, who shall keep the same safely, subject to the provisions of this agreement.

"In witness whereof the said parties have hereunto set their respective hands and seals this first day of March, 1886.

"HENRY S. HALLWOOD.    [SEAL.]

"M. H. STRAUGHAN.    [SEAL.]

"GEORGE STRAUGHAN.    [SEAL.]"

These two suits were then dismissed; but Hallwood, who had possession of this property which had been in dispute, did not surrender the possession of it for the 90 days to the trustees of the Peerless Coal Company, as the agreement provided should be done. His reasons for not complying with this part of the agreement will be stated in the opinion. After 90 days had elapsed from the date of this agreement, March 1, 1886, but before 90 days had elapsed from its execution, Hallwood offered to George Straughan in the manner specified in the opinion, the $125.00 named in this agreement as the price agreed on for this property. He had got this money from the trustee, Stevens, who lived in Cincinnati, on

a sale of this property on certain conditions or pledges, the terms of which will be explained in the opinion. But the plaintiff knew nothing of this, and supposed Hallwood kept possession of the property, after George Straughan had declined to take his offer of $125.00 for it, because he thought it was tendered too late, under a true construction of the agreement. Under this belief, on September 14, 1886, Straughan brought in the Circuit Court of Kanawha county an action of detinue to recover this property of Hallwood, who, he thought, still had it. But he discovered immediately afterwards that, directly after he had refused to take this $125.00 of Hallwood as the price of this property, he had shipped it to Cincinnati, but he did not know to whom, and he believed that he had done so to defeat the plaintiff in his action of detinue, Hallwood being an insolvent. He then, three days after he brought this action of detinue, brought the present chancery suit, setting out all the facts that are above stated, except that nothing is said about Hallwood's offer to pay to the plaintiff this $125.00, except a general allegation that "Hallwood, within the 90 days, never paid or tendered to your orator the said sum of $125.00, or any part thereof;" and nothing is said of Hallwood's having got this $125.00 of Stevens on a sale or pledge of this property, and shipped it to him in Cincinnati. All that is said in the bill on this subject is that "Hallwood had *fraudulently* removed said property beyond and out of the State, for the purpose of preventing your orator from enforcing his rights in the courts of this State, where he resides; that he had it shipped to Cincinnati, but he fraudulently secretes the same, and seeks to keep it from answering the said action of detinue, or any other process from the courts of this State to which your orator may lawfully resort." This bill prays for a discovery as to where this property is, and whether the defendant, Hallwood, had not removed it to prevent the plaintiff from getting the same by any action or suit in this State; and, if not, what was his purpose. He asks an injunction to prevent him and his agents from selling or otherwise disposing of this property; and that he be compelled to bring it back into this State; and that a receiver of the property may be appointed to whom Hallwood

should deliver this property, so that it should be forthcoming to answer said action of detinue; and for general relief. The injunction prayed for was awarded, and took effect. The answer of Hallwood sets forth the facts more fully, and states them very much as they are above stated, except that they are stated more generally, and less in detail. He says that he kept possession of this property, instead of letting the trustees of the Peerless Coal Company have the possession of it, for reasons which I need not state here, as they are fully stated in the opinion. It was very inconvenient to give this property to these trustees to keep for these 90 days, because they lived so far from the defendant, and because no harm was done by the defendant's retaining the temporary possession of it, and nobody questioned its propriety. This answer states, after the offer of this money, $125.00 as the price of the property, as set out in the agreement, within 90 days of the date of its actual signing and sealing about March 20, 1886, he considered these instruments as his own, and he shipped them to Stevens, in Cincinnati, in compliance with an agreement made with him, whereby he was to furnish the $125.00 to pay Straughan for this property, according to the compromise agreement. This shipment was not made till directly after this $125.00 was offered to Straughan. He repeats this offer to pay the $125.00, and says he is ready to pay it into court for the plaintiff. He says that, by his agreement with Stevens, he had a right to hold this property to secure himself; and he says he is informed that Stevens sold it shortly after he got possession of it. This last statement is not sustained by the evidence. Many depositions were taken. They prove the facts before stated herein, and such additional details as are stated in the opinion of this Court A supplemental bill was filed afterwards, and the circumstances under which it was filed, and its nature and contents are sufficiently set forth in the opinion, and need not here be stated. The court rendered this final decree in this cause on May 13, 1887: "This cause came on to-day to be heard upon the bill and supplemental bill of complaint, the answer of the defendant thereto, with general replication to said answer, and the depositions of witnesses taken and filed in the cause, and was argued by counsel. Upon consideration

whereof, the court is of opinion and doth decide, that the plaintiff is not entitled to the relief prayed for in said bills. It is therefore adjudged, ordered and decreed that the plaintiff's said bills be dismissed, and that the defendant recover of the plaintiff his costs by him about his defence expended, including twenty dollars, as allowed by law. And, the plaintiff desiring to present a petition to the Supreme Court of Appeals for an appeal and *supersedeas* to this decree, it is ordered that the operation and effect of this decree be suspended for the period of 60 days, upon the plaintiff, or some one for him, within 10 days from this date, executing with good security, before the clerk of this Court, a bond in the penalty of $50.00, conditioned as required by section 4 of chapter 157 of the Acts of the Legislature of 1882." From this decree Mathew H. Straughan has obtained an appeal and *supersedeas* from this Court.

*Mollohan, Ruffner & Jackson* for appellant.

*Knight & Couch* for appellee.

GREEN, JUDGE:

From the pleadings and proofs in this case it appears, that cross-actions were pending in the Circuit Court of Kanawha county on the common-law and chancery side of said court, in which Mathew H. Straughan and Henry S. Hallwood were parties. The common-law suit involved the title to a theodolite and a part of a set of drawing instruments; and the chancery cause also involved the title to this property, and some dispute about accounts between Hallwood and Straughan's father. About March 1, 1886, the parties to this litigation compromised this, and all matters between them. This compromise was to be reduced to writing by the counsel of Straughan in these suits. He did not find time to do this till March 9, 1886. He then prepared it in duplicate; and it was, after being approved by the counsel of Hallwood, sent by mail to the parties to be signed. The Straughans lived in Fayette county, and Hallwood in Kanawha county, some 13 miles from Charleston, where the counsel of the parties lived. After it was signed by the parties, it was returned to their counsel; and the original, returned by one party with his

signature attached, had then to be sent to the other party to obtain his signature. This consumed time, and it took some 11 days after these compromise agreements were prepared before they were executed by all the parties; that is, they were not *signed and sealed* till about March 20, 1886. But in drawing them they had been antedated some nine days; being dated as of the time the terms of the compromise had been verbally fixed. In this compromise agreement, as thus reduced to writing and approved by the counsel of the parties, was this provision : "The theodolite and set of drawing instruments, for which said action of *Mathew Straughan* vs. *Henry S. Hallwood* was brought, are hereby admitted to be the property of Mathew Straughan; and the said Mathew Straughan thereby agreed to sell said theodolite, and so much of said set of drawing instruments, as the justice gave judgment for, to said Hallwood, for the sum of $125.00, on the following terms and conditions : Said Hallwood was to have 90 days from the date of the signing and sealing of this agreement to pay said sum for said theodolite and part of set of drawing instruments, the title whereof was to remain in said Mathew Straughan until paid for by said Hallwood according to this agreement; and by express contract of the parties the time for paying for the same as above provided was made the essence of this agreement, and, in default thereof by said Hallwood, all his right, title, and interest thereto or therein was to be gone forever, and said theodolite and part of set of drawing instruments were to be surrendered up to said Mathew Straughan. The possession of said theodolite and part of set of drawing instruments until paid for, or default was made in the payment thereof, as above provided, was to remain with James H. Sentz and W. B. Stevens, trustees of the Peerless Coal Company, who shall keep the same safely, subject to the provisions of this agreement. In witness whereof the said parties have hereunto set their respective hands and seals this first day of March, 1886."

William B. Stevens, one of the trustees of the Peerless Coal Company, lived in Cincinnati; the other of these trustees lived in Kanawha county, West Virginia, about 20 miles from where Hallwood lived, and he was a captain of a steam-

boat, and was absent from home more than half his time. Under these circumstances, this theodolite and the drawing instruments were not delivered to them to be held by them for the 90 days spoken of in the agreement; but they remained in the possession of Hallwood, who had possession of them when this compromise agreement was made. He was not called upon by Straughan, nor by the trustees of the Peerless Coal Company, for this property, and no inquiry was made of them whether it had been delivered to them; and it is doubtful whether either of these trustees knew that they were to have the possession of this property for these ninety days. There is no evidence that any one ever gave them notice that there was any such provision in this compromise agreement. These trustees carried on the mining of the coal lands of the Peerless Coal Company in the county of Kanawha; and Hallwood was in their employment as a mining engineer, and in doing this work a theodolite was very important. This theodolite had been injured before this compromise, and, till repaired, could not be used; but it was worth a good deal more than $125.00. Hallwood was insolvent, and had not the means to pay this $125.00, and under these circumstances, he was anxious to have the use of a new theodolite, which would cost some $275.00. About six weeks after this agreement was made, he proposed to Stevens, one of the trustees of the Peerless Coal Company, and the chief manager of its mining business, that, if he would let him have $125.00 to pay to Straughan for this theodolite and drawing instruments, he could then exchange them for a new theodolite, paying the difference in their value; and the trustees of the Peerless Coal Company would have a good theodolite, so essential to the carrying on of their business successfully, and he would have the means of doing probably, the mining engineering for them better. Stevens agreed to this, and on June 11, 1886, he sent him a check on the bank of Charleston, payable to Straughan, for this $125.00, and it was promptly—probably the next day—offered to the counsel of Straughan as a payment for this theodolite and drawing instruments, under this agreement. This counsel, who thought it perfectly clear that Hallwood's right to purchase this theodolite and drawing instruments for $125.00 ex-

pired 90 days after the date of this agreement, March 1, 1886, regarded his privilege of so doing had then expired some two weeks before, and declined to receive this check, assigning this as his reason. The check was perfectly good, and the money could be got on it in a few minutes by presenting it at the bank. He said that for this reason he would not accept this check, but he would write to Straughan, and ascertain whether he would take the $125.00 then. He did so, and he declined to take this, and let Hallwood have the theodolite and drawing instruments. On the other hand, Hallwood claimed that he had thus offered to pay this $125.00 to the counsel of Straughan nearly a week before the expiration of the 90 days spoken of in this agreement as the time which he was to have within which to pay this $125.00 for the theodolite and drawing instruments, as it was to be 90 days from the date of the signing and sealing of this agreement, and it was not signed and sealed by the parties to it till about the twentieth of March, 1886.

To settle this controversy, about two months after Straughan brought an action of detinue in the Circuit Court of Kanawha for this theodolite and drawing instruments; but, as soon as he brought the suit, the sheriff, who was ordered to take possession of the property, ascertained that it was in Cincinnati. It had been shipped there by Hallwood to Stevens very shortly after the counsel of Straughan had refused Stevens's check in payment of this theodolite and drawing instruments, because in his judgment it was offered to him when the period had expired when Hallwood had a right to purchase this property for the $125.00. Hallwood kept this check for about a month, when, as Straughan, to whom it was payable, would not receive it, he returned it to Stevens, who, so far as this record shows, did not dispose of this theodolite and drawing instruments, as, under his agreement with Hallwood, he was to do, and purchase a new one, to be used by him as his employe, preferring not to do so till the controversy about it between Straughan and Hallwood was in some way settled, though he was obviously prepared to pay the $125.00, and purchase the new theodolite whenever this was done. But, though no attempt seems to have been made to prevent these facts from coming to the knowledge

of the plaintiff or his counsel, yet they knew none of the facts occurring after the refusal of the plaintiff's counsel to receive Stevens's check of $125, except that this property had all been shipped to Cincinnati, which was ascertained by the sheriff. As soon as this was ascertained, and but few days after the institution of this action of detinue, the chancery suit we are reviewing was brought in the Circuit Court of Kanawha. It set out this agreement of compromise between these parties, dated March 1, 1886, stated the facts above stated, that Hallwood had violated this agreement by keeping possession of this property, and not handing it over to the trustees of the Peerless Coal Company, fraudulently, as is charged; that he never paid or tendered to the plaintiff, Straughan, within the 90 days, the $125.00, the price at which he was authorized to buy this property. The bill then states that the plaintiff instituted this action of detinue against Hallwood, to recover this property, four days before the institution of this chancery suit, but that he had discovered since that he had *fraudulently* removed all this property to Cincinnati. It alleges that he is insolvent; and a judgment, therefore, against him in this action of detinue, would necessarily be worthless; and that the plaintiff is without remedy, save by the process of a court of equity, which can take hold of the person of Hallwood, and compel him to discover where this property is, and to bring it back into this State, and turn it over to the possession of the court, to be held to answer the result of this action of detinue; and this he prays may be done, and that he be enjoined, as well as his agents, from in any way changing the condition, possession, or situation of it, except to comply with the order of this Court; and he asks the appointment of a receiver of said property, and an order that said Hallwood deliver this property to him, to answer this action of detinue, and for general relief. The gist of this chancery suit was evidently the fraudulent removal of this property out of this State by Hallwood, an insolvent, to defeat the recovery of it in an action at law by the plaintiff; and that, as it was still in his possession, he might by a court of equity be compelled to deliver it up; he being enjoined, in the mean time, from disposing of it to any person.

The facts above stated, proved in the cause, do not sustain these allegations necessary clearly to sustain such a bill. In the first place, the defendant denies in his answer on oath, that the sending of this property by him to Cincinnati was done with this or any other fraudulent purpose. The proofs, I think, show that the property was not, as the agreement provided, placed in the possession of the trustees of the Peerless Coal Company, to be held for the 90 days, with any fraudulent purpose, but simply because one of these living in Cincinnati, and the other 20 miles from the defendant, Hallwood, it was inconvenient to deliver this property to them. Was it clear beyond dispute, as the counsel for the plaintiff claims, that under this agreement, when Hallwood tendered the $125.00 to the plaintiff within 90 days from the time this agreement was signed and sealed by the parties, about March 20, 1886, that he had not thereafter a right to said property, and a right to send it to Stevens in Cincinnati, in fulfillment of a contract or agreement made with him some time before, which contract had been complied with by Stevens, so far as up to that time he was under obligation to do anything, by sending to Hallwood the check for $125.00, payable to the plaintiff, as the price of this property? Can it be said that this contract so clearly required this money to be paid in 90 days from the date of the contract, March 1, 1886, that it must be regarded as an intentional fraud on the part of Hallwood to have pretended to regard it as authorizing the payment of this $125.00 in 90 days from the *actual* signing and sealing of this agreement, and not in 90 days from its date? The words of the contract are: "Said Hallwood is to have 90 days from the date of the signing and sealing of this agreement to pay said sum." Is it incredible that he really believed that this meant 90 days from the *actual* signing and sealing of this agreement, that is, 90 days from March 20, 1886, and not 90 days from the date of this agreement, March 1, 1886? And must we regard his conduct as fraudulent, when based on this interpretation of the contract? No doubt he knew that this 90 days' time was of the essence of the contract, and that he would have no right to pay for and own this property if not paid for in 90 days from March 20, 1886. The contract declared on its face that the

time for paying $125 for this property, was to be regarded as of the essence of the contract. It is both common sense and well settled that, by the express stipulations of parties, time may be made of the essence of a contract in a court of equity as well as in a court of law, though, without such express stipulation, it is not in a court of equity usually regarded of the essence of a contract. See *Taylor* v. *Longsworth*, 14 Pet. 172, 174. The counsel for the appellant, the plaintiff below, in his argument, seems to regard it as perfectly clear that the 90 days named in this contract must, as a legal proposition, run from March 1, 1886. He says : "This contract having declared that the 90 days should run from the date of the signing and sealing thereof, and having made that date the first of March, the 90 days must run from that time, no matter when the contract actually took effect," to sustain which proposition he refers only to 2 Pars. Cont. (6th Ed.) *664. I have examined this authority, and it is not to my mind so clear that it sustains the proposition laid down by appellant's counsel. He says "that if the contract refers to 'the day of the date,' or 'the date,' and expresses any date, this day, and not the actual making, is taken." Parsons refers in a note to *Styles* v. *Wardle*, 4 Barn. & C. 908, and Co. Litt. 46b, as sustaining the proposition he lays down; and also to *Armit* v. *Breame*, 2 Ld. Raym. 1082. These authorities sustain the proposition laid down by Parsons, but they go no further than he has gone; and there is a great difference between the phrases "the day of the date," or the "date," and the phrase used in this agreement of compromise, "the date of the signing and sealing of this agreement." I am not now prepared to say that this does not mean "the day of the *actual* signing and sealing of this agreement," though the agreement does conclude. "In witness whereof the said parties have hereunto set their respective hands and seals this first day of March, 1886." It may be, in construing this contract, that the parties may be concluded and estopped from showing that it was signed and sealed on March 20, 1886, or any other day than March 1, 1886; but I am not at present satisfied that this is so; and I do not propose to examine the question, or express any opinion on the subject, as the question in this case is not, as it is in the detinue case,

what is the true interpretation of this contract in this respect. But I will inquire simply whether its meaning is so clearly what the appellant's counsel contends it is, as to justify us in concluding that it was known to the defendant, Hallwood, that this was its meaning; and in acting on it as if this was not and pretending he thought that it was not, its meaning, we are justified in concluding that this was a mere pretense, and he was acting *fraudulently.* For his fraudulent removal of the property from the State must certainly be proven, to sustain an interference by a court of equity, as was asked in this case. It would not, I presume, be pretended that if A. had personal property in his possession in another State, and B., claiming it, brought an action of detinue for it against A. in this State, that a court of equity would enjoin A. from disposing of it on a bill filed in this State by B., and compel A., by its order, to bring such personal property into the State, to answer the result of such action of detinue, simply, because A. was insolvent.

But it is contended by appellant's counsel that, "even though Hallwood may have thought that he had a good title to this property, yet it was *fraudulent* in him to remove it, so as to avoid a suit which Straughan intended to bring against him; and this he did because, when this property was sent by Hallwood out of the State, he knew perfectly well that Straughan claimed it to be his property." This he certainly did know, and, if he removed this property to avoid a process which he expected Straughan would issue, his conduct was *fraudulent.* But Hallwood expressly, in his deposition, denies that his object in shipping this property to Stevens out of the State was to prevent Straughan from getting possession of it by legal process in this State; and does it necessarily follow that this is false because he shipped it to Stevens, according to his contract with him, directly after the plaintiff's counsel refused to accept Stevens's check in payment of the property, and claimed that the plaintiff, under this compromise agreement, was not then bound to let Hallwood have this property for the $125.00, the amount of the check? The conclusion from these facts, that the defendant, Hallwood, by sending this property to Stevens in Cincinnati, intended to keep the

plaintiff from getting possession of this property by legal process in this State, seems to me as at least questionable, as he may then have had no thought that Straughan would bring a suit for this property; and, in fact, he did not bring any such suit for nearly two months afterwards. If Hallwood had clandestinely or secretly sent this property to Stevens in Cincinnati, the conclusion that he did it fraudulently, to prevent a suit for the property against him by the plaintiff, would have been justified; but the evidence shows that he did not send off this property clandestinely, but openly. But he may have done it *fraudulently* with the intent attributed to him by the plaintiff in his bill. If we admit that he did, the plaintiff's bill would still not be sustained, unless, when it was filed, this property was in the possession of Hallwood, or under his control, though it was in Cincinnati; for if it was not in his possession or under his control on September 18, 1886, when this chancery suit was brought, it would obviously have been improper for the chancery court, in this cause, to have entered a decree requiring Hallwood to bring this property back into this State, and deliver it to a receiver of the court, in order that it might be forthcoming to answer this action of detinue. It would, if the property was then neither in his possession nor under his control, obviously be impossible for Hallwood to obey such an order of the court; and the court could not enter such an order, and punish Hallwood for not obeying it, when it was impossible for him to obey, even if the court had been satisfied that he had *fraudulently* removed this property out of the State, to defeat the plaintiff in recovering it in an action of detinue against him. Now the evidence shows that this property had been in Cincinnati in the possession of Stevens for some two months before this suit was brought, and that Stevens claimed it as belonging to him, or to the Peerless Coal Company, because it had been purchased of Hallwood more than two months before the institution of this suit. An order of the chancery court requiring Hallwood to bring this property back, and put the court or its receiver in possession of it, would have been vain and inoperative, and the court had no means of enforcing it; for the imprisonment of Hallwood till he should obey this

order would have been not only vain but unjust, as it was out of his power to obey such an order.

But it is said the receiver of the Circuit Court of Kanawha could have sued in Cincinnati Stevens, or whoever was in the possession of this property, and, having recovered it, he could have brought it back to West Virginia, and held it to answer the final judgment in the detinue suit against Hallwood. It is true that a court of one State has the power to appoint a receiver to take possession of property in another State. This has been frequently done where the property is that of a company owning and operating a railroad running through several States. See *Ellis* v. *Railroad Co.*, 107 Mass. 1; *Wilmer* v. *Railway Co.*, 2 Woods 418. In such cases the court having jurisdiction of the defendant can legitimately do all in its power to compel the defendant to put the receiver in possession of the property in another State. But, as the court of one State has no jurisdiction outside of its limits, of course it has no power to remove, or cause to be removed, personal property from another State, so as to bring it within the jurisdiction of the State in which is the chancery court which has appointed the receiver. If this can be done without contest, the personal property can be taken possession of and removed by the receiver into the State whose chancery court has appointed the receiver; but, if it can not be done without the institution of a suit by the receiver in the courts of the State where the property is situated, the authorities are not agreed as to whether such suit can be brought by a foreign receiver to recover property. In some cases, it has been allowed, and in other cases it has been refused. Such suits by receiver appointed in other States were permitted, and recognized as legitimate, in *Bagby* v. *Railroad Co.*, 86 Pa. St. 291; *Runk* v. *St. John*, 29 Barb. 585; *Hurd* v. *City of Elizabeth*, 41 N. J. Law 1. But the courts have in numerous cases, on the contrary, held that such suits can not be brought by a receiver appointed in another State. See *Booth* v. *Clark*, 17 How. 322; *Insurance Co.* v. *Needles*, 52 Mo. 17. See, also, on this question, *Insurance Co.* v. *Taylor*, 2 Rob. (N. Y.) 278; *State* v. *Railroad Co.*, 15 Fla. 202; *Warren* v. *Bank*, 7 Phila. 156; *Hunt* v. *Insurance Co.*, 55 Me. 290. In

the case of *Booth* v. *Clark*, 17 How. 322, Justice Wayne, delivering the decision of the Supreme Court of the United States, says: "The receiver has no extra-territorial power of official action, none which the courts appointing him can confer, with authority to go into a foreign jurisdiction to take possession of the debtor's property; none which can give him, upon principles of comity, the privilege to sue in a foreign court or another jurisdiction, as the judgment-creditor himself might have done, where the debtor may be answerable to the tribunal which the creditor may seek." Those cases, in which the courts permitted a receiver, appointed in another State, to sue for and recover property in a different State, have apparently based their decisions, not on the right of such foreign receiver to bring such a suit, but on the ground that, in the particular case before the court, he ought to be permitted to prosecute such suit as a matter of comity only; and that in many, if not all, cases where the rights of their own citizens would be injuriously affected by extending such comity to a foreign receiver, it ought not to extended; and the courts which are most favorable to the allowing of a foreign receiver to sue in their courts, as a matter of comity and convenience, are careful to protect the rights of their own citizens as creditors to the property of the debtor within their jurisdiction, as against the claims of a receiver appointed by a court of chancery in another State. See *Bagby* v. *Railroad Co.*, 86 Pa. St. 291; *Hunt* v. *Insurance Co.*, 55 Me. 290; *Hurd* v. *City of Elizabeth*, 41 N. J. Law, 1; *Runk* v. *St. John*, 29 Barb. 585; *Barton* v. *Barbour*, 104 U. S. 128.

To avoid the difficulties which beset a receiver in suing for property in another State, the practice has arisen of forcing the party whose property is to be taken possession of by a receiver to convey it by a formal deed or assignment to the receiver, which may enable him to bring suits in some States where his right to bring the suit might not be recognized. See *Graydon* v. *Church*, 7 Mich. 36. These authorities are conflicting, and I have not examined the question sufficiently to form any definite opinion on the question whether, if the Circuit Court in this case, as asked by the plaintiff, had appointed a receiver of this theodolite and

37

drawing instruments, the courts of Ohio would or would not have permitted him to bring an action of detinue or trover against Stevens, to recover this property or its value, and bring it within the jurisdiction and control of the Circuit Court of Kanawha, West Virginia, to answer the final decision of the action of detinue by the plaintiff against Hallwood; or whether, if the Circuit Court of Kanawha had by a decree in this cause, and its power over Hallwood, the defendant, and Straughan, the plaintiff, compelled them to execute a transfer of all their interest in this property to its receiver, the courts of Ohio would have permitted him then to bring such a suit or suits against Stevens for such a purpose. I have not deemed it necessary to determine this question; for if we considered that the receiver of the Circuit Court could in any way have been empowered to bring such suits to recover this property of Stevens, and that the Ohio courts would have permitted such suits to be brought for such purpose, it seems to me clear that the Circuit Court of Kanawha ought not to have appointed such receiver with such power in this cause. For, in the prosecution of such suit in Ohio against Stevens, there could be no recovery against him, if Hallwood had a good title to this property when, under the sale or pledge of it, he had put Stevens in the possession of it; so that the receiver would, in such suit, have had to prove that the plaintiff, Straughan, had a good title to this property, and not Hallwood. If, then, this would have been in issue in such suit by the receiver, what is the use of his being appointed, as the plaintiff, Straughan, can successfully, without the interference of a court of equity, recover this property or its value in the Ohio courts as readily as the receiver could? The right of the plaintiff to bring such suit no one disputes, or could dispute, while the right of the receiver to institute such a suit would no doubt be disputed, and, perhaps, he would not be entertained to try such suits in the Ohio courts. The remedy of the plaintiff for the wrongs he asserts he has sustained would, by no decree which the court could render in this cause, be at all improved or rendered less onerous. In fact, it is shown by the evidence that, while Stevens lives in Ohio, he is frequently in the county of Kanawha, West Virginia,

as manager of the Peerless Coal Company, managing its mining; and the plaintiff, if he chose, could institute such a suit against him in the Circuit Court of Kanawha. It is not pretended that he is not able pecuniarily to pay any judgment which could be rendered against him in such suit. The court, therefore, could render no decree on the original bill and proofs in the cause in behalf of the plaintiff, and could do nothing but dismiss the bill.

Was the plaintiff's case rendered any better by his supplemental bill? It seems to me it was not. It in substance alleges that since the filing of the bill, the defendant, Hallwood, had received, only the day before the supplemental bill was filed by leave of the court, $125.00 from Stevens, upon his pledge of this theodolite and drawing instruments, made when he sent them to Stevens in Cincinnati, some two months before the institution of this chancery suit ; and that Hallwood had this identical $125.00 in his possession, and had, only the day before the filing of this supplemental bill, so sworn in his deposition then being taken; and he produced the notes making up this $125.00, and tendered them to the plaintiff's counsel in full payment of the price of this theodolite and drawing instruments, as fixed by this compromise agreement, dated March 1, 1886. And this supplemental bill prays that he be enjoined from parting with these notes, and be required to pay them over to a receiver of this court, when appointed, to be used, if necessary, in redeeming this theodolite and drawing instruments of Stevens; and, if this can not be done, then to be used in paying the plaintiff's just claim so far as it will pay it, in case he can not get the property itself under the control of the court, and for general relief. The injunction asked has been granted. If all the facts claimed by this supplemental bill were proven, could the court render any decree based upon it in favor of the plaintiff? It seems to me it could not. When a supplemental bill is based on facts occurring since the institution of the suit, and seeks relief only against the original defendant, no new parties being introduced, it is in the nature of an amendment of the original bill, and must be read with it, and the two must be regarded as one bill; just as when an amended bill is filed, merely correcting state-

ments in an original bill, the two are regarded as constituting one bill. This proposition is abundantly sustained by
the authorities. See *Hill* v. *Hill*, 10 Ala. 527; *Cunningham's
Adm'r* v. *Rogers*, 14 Ala. 147; *Gillett* v. *Hall*, 13 Conn. 434;
*Mason* v. *Railroad Co.*, 52 Me. 107; *Clark* v. *Society*, 46 N.
H. 272; *Chouteau* v. *Rice*, 1 Minn. 106 (Gil. 83). It would
seem to follow that if, on the original bill, when all imperfections in it are disregarded, and the evidence in the cause,
the plaintiff has no cause of action at the time of filing his
original bill, he can not maintain his suit by filing a supplemental bill setting up a cause of action that had accrued
after the original bill was filed, even though it arose out of
the same cause of action that was the subject of the original
bill. A new cause of action should not thus be permitted to
be presented by a supplemental bill; for, such supplemental
bill being a part and an addition to the original bill, and to
be read with it, to permit this would be to violate the obvious
principle that in every case the cause of action must exist at
the time the suit is brought. This seems to be recognized by
the Alabama decisions. See *Hill* v. *Hill*, 10 Ala. 527;
*Vaughan* v. *Vaughan's Heirs*, 30 Ala. 330, 334. See, also,
*Milner* v. *Milner*, 2 Edw. Ch. 114, where it was held that a
complainant can not file a supplemental bill to introduce new
facts which have occurred since the filing of the original bill,
and upon which a decree can be had without reference to
the original bill. The complainant in such case should dismiss his old bill, and file an entirely new one. The law as I
have stated it, sustained by the Alabama decisions, while
not disputed, so far as I know, is nevertheless qualified by the
decision in *Pinch* v. *Anthony*, 10 Allen, 471, 477. Chapman,
J., in delivering the opinion of the Court, on page 477, says:
" We have found no authority that goes so far as to authorize
a party who has no cause of action at the time of filing his
original bill to file a supplemental bill, in order to maintain
his suit upon a cause of action that accrued after the original bill was filed, even if it arose out of the same transaction that was the subject of the original bill. It would seem
to be contrary to principle to allow it to be done. *Milner* v.
*Milner*, 2 Edw. Ch. 114, is an authority against allowing a
new cause of action to be stated in a supplemental bill. But

the plaintiff may, by means of a supplemental bill, intro-
duce into his case facts that have occurred since the original
bill was filed.   The extent to which this may be done is not
definitely settled, but, if he goes too far in this respect, the
defendant has opportunity to object to it when leave is asked
to file the supplemental bill, (*Pedrick* v. *White*, 1 Metc. 76;)
or by demurrer to the bill for that cause after it is filed.   In
this cause, the defendant did demur, but did not present this
as a ground of demurrer.   *Pinch* v. *Anthony*, 8 Allen 536.
The cause was sent to a master, and was recommitted to him,
by consent of both parties, for the purpose of being fully
heard on its merits; and it has been so heard, and his report
embraces every matter that would have been needful if a
new bill had been filed.   The objection to the supplemental
bill ought, therefore, to be regarded as waived.   *Pingree* v.
*Coffin*, 12 Gray 288, 323; Story, Eq. Pl. 528 and note; *Under-
hill* v. *Van Cortlandt*, 2 Johns. Ch. 369."

   The two cases referred to really throw no light on the sub-
ject, not being cases in which any supplemental bill was
filed, and merely showing, in certain cases, a party may
waive his right by not objecting at the proper time; and
what is said in Story amounts to no more, except that in the
note it is said that "when the matter which arises subsequent
to the filing of the bill, and properly the subject of a supple-
mental bill, is stated by amendment, and the defendant an-
swers the amended bill, it is too late to object to the irregu-
larity at the hearing."   This is doubtless true; for as the
plaintiff had a good cause of action, and the new matter
could have been legitimately brought in by a supplemental
bill, the bringing of it irregularly by an amended bill was a
matter, not of substance, but of form, and might well be re-
garded as waived by the failure to object at the proper
time, and answering such bill.   But this would be very dif-
ferent if the facts arising since the original bill were really
the only facts upon which the plaintiff had any cause of ac-
tion; there being no facts existing which gave the plaintiff
any cause of action when the original bill was filed.   In the
case before us, the supplemental bill was filed December
10, 1886, while the deposition of Hallwood, the defendant,
was being taken; and nothing whatever was done after-

wards, excepting the finishing of his examination, and the examination of a witness two days after, whose evidence was really immaterial. All the evidence thus taken after the filing of this deposition had reference solely to the matter in the original bill, and in no manner related to the new matter set out in the supplemental bill. In less than a month afterwards, the court heard the case, and dismissed the bill and supplemental bill. Even if the defendant could waive an objection based on the fact that the plaintiff had no cause of action when he instituted his suit, but it arose subsequently, there was certainly no such waiver to be inferred from anything done by him in this cause subsequent to the filing of this supplemental bill. But it does not seem to me that mere failure to object to its filing, or to demur to it, could in no case prevent his relying on the fact that the evidence showed that when the plaintiff had brought his suit, and filed his bill, he had no cause of action.

There is another objection to this supplemental bill, so fatal that the court was bound to dismiss it at the hearing. The supplemental bill being but an addition to the bill, and, as asked for on the very face of this bill, to be read with it, of course no decree could be rendered upon it if it was based upon grounds, and sought a redress, utterly inconsistent with the original bill. In such case, the court, at the hearing, might give to the statements and grounds set out in the original bill and in the supplemental bill a liberal construction, so as to reconcile them, and might not refuse the plaintiffs relief simply because some of the statements of the supplemental bill were in conflict with statements in the original bill. *Chouteau* v. *Rice*, 1 Minn. 106, (Gil. 83.) But it could do no more. If, after this were done, it still appeared that the grounds on which the original bill was based were utterly inconsistent and irreconcilable with the grounds on which this supplemental bill was based, the court could grant no relief to the plaintiff on his supplemental bill. The ground on which this supplemental bill is based is that the theodolite and drawing instruments were a trust-fund in the hands of the defendant, Hallwood, for the use of the plaintiff; and he having, by a sale or pledge of them, received a check for $125.00, which was still in his hands, and

could be clearly identified, this check should be rendered liable to all the rights of the plaintiff, just as the original property held in trust could have been held, had it not been wrongfully converted into these notes. This claim is based on the familiar principle that where a trust-fund has been wrongfully converted into another species of property, if its identity can be traced, it will be held in its new form, liable to the rights of the original owner or *cestui que trust.* The appellant's counsel refers to *Bank* v. *Insurance Co.*, 104 U. S..54; 26 Amer. Law Reg. 71, (February, 1887,) and notes to *Fletcher* v. *Sharpe*, 9 N. E. Rep. 142, decided by Supreme Court of Indiana; and 2 Story, Eq. Pl. §§ 12, 58,—as establishing this legal proposition, which he states in his brief. There is no question but these, and innumerable other cases show clearly that this is the law. The difficulty is, the evidence shows beyond controversy that the defendant, Hallwood, never did occupy any confidential relation of any sort to the plaintiff, Straughan, and the property in controversy never was a trust-fund in the hands of Hallwood for the use of Straughan, and therefore this law has no sort of application in this cause. The plaintiff brought an action of detinue against the defendant for this property, which he could not have done, if the plaintiff held it for his use as trustee, his only remedy against his trustee, the defendant, being by a suit in equity. In his original bill, the plaintiff maintains the same attitude that he assumed when he brought his action of detinue. In fact, the original bill was filed as an auxiliary proceeding to aid the plaintiff in his action of detinue, by compelling the defendant, or a receiver of the court, to bring the property in dispute back into this State from the State of Ohio, so that it might be here to answer the judgment anticipated in the action of detinue then pending. The claim that the plaintiff was the legal and equitable owner of the property, which the defendant had wrongfully got possession of under a false claim that he was the legal and equitable owner thereof, which is the ground on which the original bill is based, is wholly inconsistent with the ground on which the supplemental bill is based,—that the defendant

held this property as trustee for the use of the plaintiff, and had wrongfully converted it into bank-notes. The two grounds are utterly irreconcilable; and for this reason, as well as the others I have assigned, this supplemental bill should have been dismissed.

There was no error, therefore, in the decree of the Circuit Court of Kanawha of January 18, 1887, appealed from, and it must be affirmed, and the appellee must pay to the appellant his costs in this Court expended and $30 damages.

AFFIRMED.